UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

ERIN HISCHIER, individually and on behalf
of all others similarly situated,

    Plaintiff,

v.

ANDERSON HEALTHCARE d/b/a
ANDERSON HOSPITAL,

    Defendant.

Case No. 23cv3953

## NOTICE OF REMOVAL

Defendant Anderson Healthcare d/b/a Anderson Hospital ("Defendant" or "Anderson Hospital") removes this putative class action from the Circuit Court of Madison County, Illinois to this Court pursuant to the federal officer statute, codified at 28 U.S.C. § 1442 (a)(1).

### INTRODUCTION

1. This case is one of numerous website privacy cases that have been filed against healthcare providers throughout the nation.

2. The underlying factual basis for Plaintiff's complaint is that Defendant allegedly engaged in unlawful disclosures and invaded her privacy by using the Meta Pixel and Google Analytics on Defendant's public website.

3. Because the conduct challenged by Plaintiff was undertaken pursuant to the federal government's extensive efforts to build a nationwide health information technology infrastructure over the past two decades, this case is removable under the Federal Officer Removal statute. 28 U.S.C. § 1442(a)(1).

4. In similar circumstances, other courts have held that removal is proper under the

federal officer removal statute. *See Doe I v. UPMC*, No. 20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 20-cv-1581, 2020 WL 7705627, at *2–3 (N.D. Ohio Oct. 30, 2020). In support of removal, Defendant provides the below "short and plain statement of the grounds for removal" pursuant to 28 U.S.C. § 1446(a).

## NATURE OF THE CASE

5. On October 31, 2023, Plaintiff Erin Hischier filed this action in the Circuit Court of Madison County, Illinois.

6. Plaintiff alleges that Defendant is a health care provider located in Madison County, Illinois and maintains various web-properties, including www.andersonhospital.org, which is allegedly used "to search for physicians, locate healthcare facilities, learn about specific health conditions and treatment options, pay bills, sign up for classes and events, and more." Compl. ¶¶ 6-7.

7. Plaintiff is allegedly "a patient of Anderson Hospital." *Id.* at ¶ 28.

8. According to Plaintiff, "Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.'" *Id.* at ¶ 62.

9. Plaintiff also alleges that Defendant "employed trackers from Google, Site Scout, Trade Desk, and Appnesux." *Id.* at ¶ 64.

10. Plaintiff further alleges that the tracking technologies shares information including "As the patient loads a page about Anderson Hospital's Patient Portal ("Patient Portal Landing Page"), Anderson Hospital then sends another set of PageView and Microdata events, informing Facebook that the user is now on the page for "MyHealth Patient Portal," which "enables you to

conveniently access your medical records, test results, and appointments." *Id.* at ¶ 70(b).

11. Despite Plaintiff's conclusory allegations, the alleged transmitted information is not personally identifying information ("PII") connected to a person's actual name, but instead consists of Internet-related metadata that enables the website to function, such as a webpage's Universal Resource Locator ("URL") and cookie identifiers.

12. Nonetheless, Plaintiff speculates that because she used Defendant's website, Anderson Hospital "assisted Facebook, Google, and others with intercepting Plaintiff Hischier's confidential communications, including those that contained PII and protected health information ("PHI"). Anderson Hospital facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization" *Id.* at ¶ 85.

13. Plaintiff asserts the following claims against Defendant: (1) negligence; (2) invasion of privacy; (3) breach of implied contract; (4) unjust enrichment; (5) breach of fiduciary duty; and (6) violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS § 505/1 *et seq*.

## VENUE

14. Removal to this District is proper because this Court embraces Madison County, Illinois. 28 U.S.C. § 130(b).

## BASES FOR REMOVAL

15. Removal is proper under the federal officer removal statute.

16. Under 28 U.S.C. § 1442(a)(1), a civil action that is "against or directed to" any of the following may be removed to federal court: "(1) the United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency therefore, in an office or individual capacity, *for or relating to any act under color of such office . . .*" 28

U.S.C. § 1442(a)(1) (emphasis added).

17. The United States Supreme Court has held that the federal officer removal statute is to be broadly construed to allow defendants to remove whenever they are acting under color of federal office. *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981); *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994)); *see also Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (observing that the scope of the federal officer removal statute "is not narrow or limited").

18. Indeed, the Seventh Circuit has held that "the presumption against removal in ordinary diversity jurisdiction cases does not extend to the federal officer removal statute" and has recognized that "the Supreme Court has made clear that courts must liberally construe § 1442(a)." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) (citing *Hammer v. United States Dep't of Health & Human Servs.*, 905 F.3d 517, 526–27 (7th Cir. 2018); *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007)).

19. "Federal officer removal is proper when the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense." *Betzner*, 910 F.3d at 1015 (citing *Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 589–90 (7th Cir. 2016)).

20. In this case, Plaintiff's claims relate to conduct undertaken by Defendant in furtherance of the federal government's Meaningful Use Program.

21. Since at least 2004, the federal government – through executive order, legislation, and regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology.

22. Specifically, the federal government has incentivized and directed providers (like Defendant) that participate in the Medicare and Medicaid program to offer patients online access to their records, and to optimize patient engagement with their medical information.

23. The federal government has also exhibited the behavior it wants to see by creating a portal for Medicare beneficiaries and working with the same third-party services with the same or similar "source code" at issue in this case.

24. Defendant has faithfully assisted and followed the federal government's direction in connection with the actions challenged by Plaintiff here. In so doing, Defendant has acted within the penumbra of federal action and office. Accordingly, pursuant to the Supreme Court and Seventh Circuit's directive that the statute must be liberally construed, and because this lawsuit challenges this federally directed conduct, the requirements of the federal officer removal statute are satisfied.

**A. The National Health Information Technology Coordinator Creates Nationwide Health Information Technology in Conjunction with the Private Sector Through the Meaningful Use Program.**

25. In 2004, President Bush established a National Health Information Technology Coordinator ("ONC"). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to trigger a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

26. In 2009, Congress codified the Office of the National Coordinator in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009). At that time, Congress allocated billions of dollars to the Center for Medicare and Medicaid Services ("CMS") to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.* at 246.

27. Congress also tasked the National Coordinator with, *inter alia*, "updat[ing] the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics with respect to": "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information" and "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(c)(3)(A) (Strategic plan).

28. Consistent with its mandate, the ONC has published guidance for private providers to follow, including in five-year strategic plans. In the 2015–2020 plan, it dictated that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use."[1]

29. In the 2020–2025 plan, it noted that this has already happened, stating that "[f]ederal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare."[2]

30. One important aspect of this strategy is CMS's "Meaningful Use" Program. 42 C.F.R. § 495.2–495.370; *see also* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES, *Medicare and Medicaid Programs; Electronic Health Record Incentive Program*, 75 Fed. Reg. 44314 (Jul. 28, 2010).

31. As the name implies, the program aims to increase patient's "meaningful use" and engagement with electronic health records. In introducing the final regulations, the agencies stated that "[c]ertified [electronic health records ("EHR")] technology used in a meaningful way is one

---

[1] ONC, Federal Health Information Technology Strategic Plan 2015-2020, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf.
[2] ONC, Federal Health Information Technology Strategic Plan 2020-2025 available at https://www.healthit.gov/sites/default/files/page/202010/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf.

piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.* at 44321.

32. Under this program, providers must meet certain criteria to receive full Medicare reimbursement.

33. As part of the program, the federal government directed providers to create interoperable patient portals that allow users to communicate directly with their providers and immediately access (or transfer) their medical records. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients the ability to view online, download, and transmit information about a hospital admission."); *see also* REBECCA MITCHELL COELIUS, *Get the Facts Regarding View, Download and Transmit 2014 requirements*, HealthITbuzz, The Latest on Health IT from the ONC, at 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.").

34. The ONC has specified "how a patient portal helps achieve meaningful use requirements," as well as how a provider can "actively promote and facilitate portal use" and how providers can optimize such portals – explaining that they "must be engaging and user-friendly."[3]

35. The ONC has also issued a "Patient Engagement Playbook," which was described as "a tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT – particularly electronic health records (EHR) patient portals – to engage

---

[3] ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013), available at https://www.healthit.gov/sites/default/files/nlc_how_to_ optimizepatientportals _for_patientengagement.pdf.

patients in their health and care." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Patient Engagement Playbook* (last updated Apr. 17, 2019).

36. Regulations require health care providers to attest to the National Coordinator and to CMS on their progress with respect to this criterion in particular. *See* 45 C.F.R. § 170.315(e)(1)(i) (requiring reporting on "Patient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3rd party the data specified below," including "[t]he Common [Meaningful Use] Data Set").

37. Regulations also provide for incentive payments for providers who reached certain levels of engagement with electronic health record use through the patient portal. *See* 42 U.S.C. § 1395w-4(o) (incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic & Clinical Health (HITECH) Act*, at 2 CONG. RES. SERV. (Apr. 27, 2009) (discussing various financial incentives).

38. In addition to this guidance, CMS created its own portal, offering a model for private providers to follow.

39. To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook.

40. By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them.[4]

---

[4] *See generally* Medicare.gov Privacy Policy, available at https://www.medicaid.gov/privacy-policy/index.html (explaining that website users' "activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS) (last visited June 14, 2023).

B.     **Defendant Is A "Person" Under 28 U.S.C. § 1442(a)(1).**

41.    Removal under the statute is permitted by "any **person** acting under [a federal] officer." 42 U.S.C. § 1442(a)(1) (emphasis added).

42.    Consistent with the Supreme Court's command that the statute be construed broadly, organizations, corporate defendants, and government entities have routinely been deemed "persons" who can remove actions under the statute. *See, e.g.*, *Betzner*, 910 F.3d at 1015 ("Corporations are persons under § 1442(a), and so, Boeing has easily satisfied the 'person' requirement within the meaning of the federal officer removal statute.").

43.    Because Defendant is a non-profit corporation, Compl. ¶ 29, it qualifies as a person under that statute.

C.     **Defendant Acted Under a Federal Officer.**

44.    An entity is acting under a federal officer whenever it is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior" and is subject to "subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151–52 (2007). The phrase "acting under" includes "situations where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Betzner*, 910 F.3d at 1015.

45.    To that end, the federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147–49.

46.    These requirements are met here because the federal government is incentivizing, regulating, monitoring, and supervising Defendant's actions in the Meaningful Use Program to meet the federal government's national priority of interoperable health information technology.

47.    First, Defendant (along with many other entities) is helping the government

produce the nationwide, interoperable information technology infrastructure for health information.

48. The federal government itself has repeatedly acknowledged the private sector's essential role in this project, most recently stating that the federal government and private sector "have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

49. Second, in the absence of Defendant's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission – and would likely do exactly that, as underscored by its efforts to digitize information and increase patient engagement with Medicare beneficiaries.

50. Third, the government has specified how to best enhance patient engagement, including through patient portals.

51. It has clarified how to generally design the portals and has told entities how best to market their online resources.

52. Furthermore, because the Meaningful Use Program's incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes Defendant and comparable organizations not only to maintain public websites and/or patient portals, but also to achieve meaningful use of them. And, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

53. Finally, the government has created an office dedicated to this endeavor, closely monitored the work of private entities (like Defendant) and supervised the general development of this information technology infrastructure.

**D.     Plaintiff's Claims Are For Or Relate to Acts Under Color of the Federal Office.**

54.     Plaintiff directly challenges Defendant's website analytics practices, as well as its alleged tracking of online behaviors through source code, cookies and use of marketing companies such as Facebook to promote online patient engagement.

55.     The Meaningful Use Program envisions these activities, as evidenced by the federal government's own use of these codes and third parties for its Medicare website.

56.     In like circumstances, courts have held that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *See, e.g.*, *UPMC*, 2020 WL 4381675, at *6 (holding that the UPMC's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at *2-3 (N.D. Ohio Oct. 30, 2020) ("Because [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

57.     In *UPMC*, as in this case, the plaintiffs sought redress under state law for UPMC's alleged disclosure of the plaintiffs' PII to third parties for Internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The *UPMC* court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *Id.* at *6 ("UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria."). The *UPMC* court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly

wrongful conduct was outside the scope the private entity's duties is the very thing that should be left to a federal court to decide." *Id.* at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." *Id.*

58. Here, as in *UPMC*, "[t]here is plainly a connection or association between [Defendant's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability." *Id.* at *6.

59. As shown above, Plaintiff's claims are therefore "for or relating to an act under color of federal office." *Id.* (internal quotations omitted)*; see also Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) ("Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government.") (citing *Maryland v. Soper (No. 1),* 270 U.S. 9, 30 (1926) (chauffeur assisting prohibition agents in distillery raid "has the same right to the benefit" of the federal officer removal statute as the agents); *Davis v. South Carolina,* 107 U.S. 597, 600 (1883) (permitting removal by Army corporal who assisted federal revenue officers in distillery raid)).

   **E.**  **Defendant Raises Colorable Federal Defenses to Plaintiff's Claims.**

60. The final requirement for removal under 42 U.S.C. § 1442(a)(1) is a low bar and requires only that the defendant make an assertion that is "defensive" and "based in federal law." *Mesa v. California*, 489 U.S. 121, 129–30 (1989).

61. A "colorable federal defense" need not be "clearly sustainable," but rather "need only be plausible." *Betzner,* 910 F.3d at 1014-15 (holding that "jurisdictional allegations control unless it is legally impossible for them to be true", that "a colorable federal defense under § 1442(a) need only be plausible," and that "at this point, we are concerned with who makes the ultimate determination, not what that determination will be."); *see also Willingham v. Morgan,* 395 U.S.

402, 407 (1969) (recognizing that a defendant invoking § 1442(a) "need not win his case before he can have it removed."); *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994) ("A federal defendant need not show that he is entitled to *prevail* in order to have access to the federal forum.").

62. By way of illustration and without limitation, Defendant has at least two colorable federal defenses to the claims at issue here that satisfy this requirement.

63. First, Plaintiff specifically refers to federal law – including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and guidance from the Department of Health and Human Services ("HHS") and the Office for Civil Rights ("OCR") – to describe Defendant's alleged duty of confidentiality involving protected health information ("PHI") and to describe the scope of the PHI that allegedly was shared. *See* Compl. ¶¶ 95-102

64. Thus, in response to Plaintiff's repeated claims that PII and "protected health information" were disclosed, Defendant will argue that the information purportedly disclosed is outside of the purview of PHI protected by federal law.

65. In an analogous case against numerous health care providers, the United States District Court for the Northern District of California has held that the information identified by Plaintiff here is not PHI. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954–55 (N.D. Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to satisfy this element.

66. Second, to the extent that Plaintiff could allege a viable cause of action under Illinois law, Defendant will argue that federal law preempts Plaintiff's common law claims. *See UPMC*, 2020 WL 4381675 at *7 ("A defense based on federal preemption of state law is also sufficient to raise a colorable federal defense for the purposes of the federal officer removal statute.").

67.     Finally, under Seventh Circuit precedent, "removal need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020) (citations omitted).

68.     Because each of the requirements of the federal officer removal statute is satisfied, removal to this Court is proper. *See Betzner*, 910 F.3d at 1016 ("Because Boeing's allegations supporting its § 1442(a) notice of removal are plausible on their face, this case belongs in federal court.").

## REMOVAL PROCEDURES

69.     Defendant files this Notice of Removal within thirty days of Defendant receiving the Complaint on November 16, 2023. 28 U.S.C. § 1446(b).

70.     Defendant attaches a copy of "all process, pleadings, orders, and other documents" currently on file in the state court as **Exhibit A** hereto. *Id.* § 1446(a).

71.     Defendant will promptly give written notice to all adverse parties and the clerk of the Madison County Circuit Court, Illinois. *Id.* § 1446(d).

## CONCLUSION

Plaintiff's Complaint directly challenges practices and procedures Anderson Hospital has taken acting under color of federal law, and this case is therefore removable to this Court under 28 U.S.C. § 1442(a)(1).

Dated: December 15, 2023

Respectfully submitted,

By: /s/ Amy L. Lenz
Amy L. Lenz
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 4500
Chicago, IL 60606
(312) 416-6200
alenz@bakerlaw.com

Paul G. Karlsgodt (*pro hac vice forthcoming*)
Jonathan Maddalone (*pro hac vice forthcoming*)
BAKER & HOSTETLER LLP
1801 California Street, Ste. 4400
Denver, CO 80202
(303) 861-0600
pkarlsgodt@bakerlaw.com
jmaddalone@bakerlaw.com

Lisa A. Houssiere (*pro hac vice forthcoming*)
BAKER & HOSTETLER LLP
811 Main Street, Ste. 1100
Houston, TX 77002
(713) 646-1318
lhoussiere@bakerlaw.com

*Attorneys for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2023, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system and sent via email to the following attorneys:

David Cates, #6289198
THE CATES LAW FIRM, LLC
216 West Pointe Drive, Suite A
Swansea, IL 62226
Telephone: (618) 277-3644
Facsimile: (618) 277-7882
Email: dcates@cateslaw.com

Lynn A. Toops (Pro Hac Vice forthcoming)
Amina A. Thomas (Pro Hac Vice forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
athomas@cohenandmalad.com

J. Gerard Stranch, IV (Pro Hac Vice forthcoming)
Andrew E. Mize (Pro Hac Vice forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks A venue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

Samuel J. Strauss (Pro Hac Vice forthcoming)
Raina Borelli (Pro Hac Vice forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

/s/ Amy L. Lenz